No. 756　　　　　August 12, 2026　　　　　105

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

PACIFICORP,
dba Pacific Power,
*Petitioner,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON;
Alliance of Western Energy Consumers;
Calpine Solutions, LLC;
The Klamath Water Users Association;
The Oregon Citizens' Utility Board; Sierra Club;
and Vitesse, LLC,
*Respondents.*

Public Utility Commission of Oregon
UE420;
A183803

Argued and submitted October 2, 2025.

Dallas DeLuca argued the cause for petitioner. Also on the briefs were Joseph M. Levy and Markowitz Herbold PC.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent Public Utility Commission of Oregon. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

No appearance for respondents Alliance of Western Energy Consumers, Calpine Solutions, LLC, The Klamath Water Users Association, The Oregon Citizens' Utility Board, Sierra Club, and Vitesse, LLC.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Reversed and remanded.

**AOYAGI, P. J.**

PacifiCorp seeks judicial review of a final order of the Public Utility Commission of Oregon (PUC). As relevant here, the order excludes from Oregon electricity rates certain costs incurred by PacifiCorp to comply with the Washington Climate Commitment Act (CCA), RCW 70A.65.005 to 70A.65.901, with respect to electricity generated at PacifiCorp's natural gas power plant in Chehalis, Washington, and delivered to customers in Oregon. *See* ORS 756.040(1) (the PUC is to set public utility rates). For the reasons explained below, we reverse and remand for reconsideration.

We review PUC orders as orders in contested cases in accordance with ORS 183.480 to 183.497. ORS 756.610(1). "As such, our review is 'confined to the record,' and we will 'not substitute [our] judgment for that of the [PUC] as to any issue of fact or agency discretion.'" *Calpine Energy Solutions LLC v. PUC*, 298 Or App 143, 156, 445 P3d 308 (2019) (*Calpine*) (quoting ORS 183.482(7) (brackets in *Calpine*)). We review for legal error and for whether the order is supported by substantial evidence in the record. ORS 183.482(8)(a), (c); *Calpine*, 298 Or App at 156.

In the order on review, the PUC excluded from Oregon electricity rates the costs of PacifiCorp's compliance with the CCA. The PUC did so based on its interpretation of the 2020 PacifiCorp Inter-Jurisdictional Allocation Protocol (Protocol), an agreement between a variety of stakeholders and government entities that was approved by the PUC in PUC Order No. 20-024 (Jan 23, 2020), *amended by* PUC Order No. 23-229 (June 30, 2023). The PUC concluded that CCA compliance costs are costs associated with a state-specific initiative and that, under section 3.1.2.1 of the Protocol, they should be assigned entirely to Washington.

PacifiCorp contends that the PUC misinterpreted the Protocol. Under PacifiCorp's reading, the Chehalis power plant is a system resource, and the costs of CAA compliance are to be assigned as provided in section 3.1.2.2. PacifiCorp views the CCA compliance costs as akin to a tax and argues that they should be treated as "[g]eneration-related dispatch costs" subject to section 3.1.7.

As an initial matter, the parties disagree as to whether we should defer to the PUC's interpretation of the Protocol—on the theory that the PUC's approval of the Protocol made it a rule or akin to a rule—if such interpretation is a plausible one. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (explaining that courts will defer to an agency's plausible interpretation of an administrative rule in some circumstances). We need not resolve that point of procedure, however, because we agree with PacifiCorp that the PUC's interpretation of the Protocol is not plausible, such that the disposition would not be affected by resolving that issue.

A "resource" is defined in the Protocol as "a Company-owned generating unit, plant, mine, long-term Wholesale Contract, Short-Term Purchase and Sale, Non-firm Purchase and Sale, or QF Contract." The parties agree that this case involves an "Interim Period Resource." Section 3.1.2 provides that "Interim Period Resources will be allocated to one of two categories for inter-jurisdictional allocation purposes: State Resources or System Resources." It goes on to describe three types of state resources, provides that all other types of interim period resources are system resources, and notes that the substantial majority of PacifiCorp's resources are system resources. It then lays out how "[b]enefits and costs associated with each category and type of Interim Period Resources will be assigned or allocated to States."

Section 3.1.2.1 addresses state resources, and section 3.1.2.2 addresses system resources. Those sections state as follows, in relevant part:

### "3.1.2.1  Interim Period State Resources

"Benefits and costs associated with the three types of State Resources will be assigned or allocated as follows:

> "• Demand-Side Management (DSM) Programs: \*\*\*.
>
> "• Portfolio Standards: The portion of costs associated with Interim Period Resources acquired to comply with a State's Portfolio Standard adopted, either through legislative enactment

or by a State's Commission, that exceed the costs PacifiCorp would have otherwise incurred, will be allocated on a situs basis to the Jurisdiction adopting the Portfolio Standard.

"• State-Specific Initiatives: Costs and benefits associated with Interim Period Resources acquired in accordance with a State-specific initiative will be allocated and assigned on a situs basis to the State adopting the initiative. State-specific initiatives include, but are not limited to, the costs and benefits of incentive programs, net-metering tariffs, feed-in tariffs, capacity standard programs, solar subscription programs, electric vehicle programs, and the acquisition of renewable energy certificates.

"**3.1.2.2  Interim Period System Resources**

"All Interim Period Resources that are not State Resources are System Resources and will be allocated [between the various states in specified ways]."

Interpreting those provisions, the PUC concluded that the CAA—viewed in its context, which includes the Washington Clean Energy Transformation Act, RCW 19.405.010 to 19.405.901—is properly understood as "a program that implements a State-specific initiative." That is, it falls under the third bullet point in section 3.1.2.1. From there it follows, according to the PUC, that the costs of CAA compliance should be allocated "on a situs basis" to Washington, as "the State adopting the initiative."

As PacifiCorp points out, however, section 3.1.2.1 applies only to interim period resources *acquired* in accordance with a state-specific initiative: "Costs and benefits associated with Interim Period Resources acquired in accordance with a State-specific initiative will be allocated and assigned on a situs basis to the State adopting the initiative." It is silent as to other costs associated with state-specific initiatives. And any interim period resources not covered by section 3.1.2.1 are automatically covered by Section 3.1.2.2, which provides for a different allocation of costs.

Here, the Chehalis plant was acquired long before the CCA's enactment, so we do not see how it could have been "acquired in accordance with" the CCA. To the extent that the PUC viewed the CCA itself, or its associated costs, as the interim period resource, that is inconsistent with the Protocol's definition of "resource" as "a Company-owned generating unit, plant, mine, long-term Wholesale Contract, Short-Term Purchase and Sale, Non-firm Purchase and Sale, or QF Contract."

Because the PUC relied on section 3.1.2.1 of the Protocol in reaching its decision, and because its interpretation of that provision was legally erroneous (and implausible based on the plain text), we reverse and remand to the PUC for reconsideration of its order.

In doing so, we acknowledge that the Protocol contains a provision that "[t]he proposed allocation of a particular expense or investment to a State under the 2020 Protocol is not intended to and will not prejudge the prudence of that cost or the extent to which any particular cost may be reflected in rates." The PUC is statutorily required to "balance the interests of the utility investor and the consumer in establishing fair and reasonable rates." ORS 756.040(1). To be "fair and reasonable," rates must provide adequate revenue for both operating expenses and capital costs, with a return to the equity holder that meets certain standards. *Id*. At the same time, the PUC is to "represent the customers of any public utility *** and the public generally in all controversies respecting rates" and is to "make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates." *Id*. Because the PUC thought that it was acting in accordance with the Protocol, it never reached the issue whether deviating from the allocation provided by the Protocol was necessary to achieve fair and reasonable rates. *Cf. PacifiCorp v. Idaho Public Utilities Commission*, 579 P3d 904, 906 (Idaho 2025) (relying on the Idaho Public Utilities Commission's general ratemaking authority in affirming a commission order excluding CCA compliance costs from Idaho rates, without

addressing the commission's alternative reasoning under the Protocol). That is necessarily an issue for the PUC to address on remand, as PacifiCorp acknowledged at oral argument.

Reversed and remanded.